**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br>Department of Justice, Antitrust Division<br>450 Fifth Street NW<br>Washington, DC 20530,<br><br>*Plaintiff*,<br><br>v.<br><br>ACTIVISION BLIZZARD, INC.<br>3100 Ocean Park Blvd<br>Santa Monica, California 90405,<br><br>*Defendant*. | Civil Action No.: |

**COMPLAINT**

The United States of America brings this civil antitrust action against Activision Blizzard, Inc. ("Activision").  Activision, a leading video game developer, owns and operates professional esports leagues built around two of its most popular team-based games, *Overwatch* and *Call of Duty*.  For years, Activision and the independently owned teams in each league agreed to impose a "Competitive Balance Tax."  The Tax, which effectively operated as a salary cap, penalized teams for paying esports players above a certain threshold and limited player compensation in these leagues.  This conduct had the purpose and effect of limiting competition between the teams in each league for esports players and suppressed esports players' wages. This conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and should be enjoined.

1

## I.     INDUSTRY BACKGROUND

1.      Today, few pastimes in the United States match the popularity and cultural impact of video games.  An estimated 60 percent of Americans report they play video games on a weekly basis, and total consumer spending on video games in the United States reportedly topped $56 billion in 2022.  Today's video game fans are not just interested in *playing*, but *watching* others play their favorite games on streaming sites such as Twitch and YouTube.

2.      Two of Activision's most popular multiplayer video games are *Overwatch* and *Call of Duty*.  *Overwatch* became one of the best-selling video games in 2016, its first year of release, and has since attracted millions of players.  Since the release of the original *Call of Duty* game in 2003, Activision has published 18 additional titles in the series and reportedly has sold more than 400 million units, making it one of the best-selling video game franchises in history.

3.      To capitalize on the success of *Overwatch* and *Call of Duty*, Activision created two professional esports leagues that feature teams comprising the very best *Overwatch* and *Call of Duty* players in the world.  Launched in 2018, Activision's *Overwatch* League currently has 20 city-based teams located across North America, Europe, and Asia.  The popularity of Activision's *Overwatch* League has been a leading contributor to the growth of esports in the United States.  Soon after, in 2020, Activision launched its *Call of Duty* League with twelve teams using the same city-based model as the *Overwatch* League.

4.      The *Overwatch* and *Call of Duty* Leagues have generated hundreds of millions of dollars for Activision from franchise fees, sponsorship revenues, exclusive streaming deals with YouTube, and the *Overwatch* League's television broadcast deal with Disney (including subsidiaries ESPN and ABC).  Millions of viewers around the world have tuned in to watch professional *Overwatch* and *Call of Duty* players compete in league matches.  In the inaugural season of the *Overwatch* League, 107 million viewers streamed matches over Twitch.  By the

next year, it was the most watched esports league in the world with more than 75.9 million hours

watched.  The *Call of Duty* League's official streaming channels attract more than 15 million

views per month, and more than 300,000 viewers tuned in to the inaugural league championship

in 2020.

5.      The *Overwatch* and *Call of Duty* Leagues, like other sports leagues, feature

independently owned teams that not only compete to win matches, but also compete to hire and

retain the best players.  Because *Overwatch* and *Call of Duty* are both multiplayer, team-based

games, teams in the *Overwatch* and *Call of Duty* Leagues must recruit and sign a roster of

players who fill different roles within the game and can work with and complement their

teammates' skills.  Esports pros spend thousands of hours practicing and honing their skills for a

chance to make a professional roster; once they sign with a team, many players train at least

eight hours every day and up to 70 hours each week.

6.      Esports athletes often have short careers as a result of the intense physical and

mental toll of elite competition, and thus have limited time to maximize their earnings.

## II.     THE COMPETITIVE BALANCE TAX SUPPRESSED COMPETITION BETWEEN THE TEAMS FOR ESPORTS PLAYERS AND SUPPRESSED WAGES

7.      From the inception of each league, Activision and the teams agreed to impose

rules that had the purpose and effect of substantially lessening competition for players by

suppressing player compensation.  Under these rules, which Activision called the "Competitive

Balance Tax," teams were fined if their total player compensation exceeded a threshold set by

Activision each year.  For every dollar a team spent over that threshold, Activision would fine

the team one dollar and distribute the collected sum pro rata to all non-offending teams in the

league.  For example, if Activision set a Competitive Balance Tax threshold of $1 million, a

team that spent $1.2 million on player compensation in a season would pay a $200,000 fine,

which would be distributed to the other teams.

8.      Teams recognized that their spending on player compensation would have been

higher absent the Competitive Balance Tax.  The Tax minimized the risk that one team would

substantially outbid another for a player.  The Tax not only harmed the highest-paid players, but

also depressed wages for all players on a team.  For example, if a team wanted to pay a large

salary to one player, the team would have to pay less to the other players on the team to avoid the

Tax.  Teams also understood that the Tax incentivized their competitors to limit player

compensation in the same way, further exacerbating the Tax's anticompetitive effects.

9.      While players in other professional sports leagues have agreed to salary

restrictions as part of collective bargaining agreements, the players in Activision's esports

leagues are not members of a union and never negotiated or bargained for these rules.

10.     In October 2021, as a result of the Department of Justice's investigation into the

Competitive Balance Tax, Activision issued memoranda to all teams in the *Overwatch* and *Call

of Duty* Leagues announcing that it would no longer implement or enforce a Competitive

Balance Tax in either league.

11.     The agreements between Activision and the teams in the *Overwatch* and *Call of

Duty* Leagues to impose the Competitive Balance Tax constituted an unreasonable restraint of

trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Activision should be enjoined

from implementing the Competitive Balance Tax or any similar rule or restraint that, directly or

indirectly, imposes an upper limit on compensation for any player or players in any professional

esports league that Activision owns or controls.

### III.    JURISDICTION AND VENUE

12.    Activision is engaged in interstate commerce and in activities substantially affecting interstate commerce.  Activision transacts business throughout the United States. *Overwatch* League and *Call of Duty* League are international professional esports leagues owned by Activision, and each league consists of independently owned city-based teams located across the United States and other parts of the world, including an *Overwatch* League team located in Washington, D.C.

13.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1337, and Section 4 of the Sherman Act, 15 U.S.C. § 4, to prevent and restrain Activision from violating Section 1 of the Sherman Act, 15 U.S.C. § 1.

14.    Activision has consented to venue and personal jurisdiction in the District of Columbia.  Venue is also proper in this judicial district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391.

### IV.    DEFENDANT ACTIVISION BLIZZARD

15.    Defendant Activision is a Delaware corporation headquartered in Santa Monica, California.  Activision is a video game developer and publisher whose business includes the video game franchises *Overwatch* and *Call of Duty*, and the respective esports leagues for both franchises.

### V.    VIOLATION ALLEGED

**(Violation of Section 1 of the Sherman Act)**

16.    The United States repeats and realleges paragraphs 1 through 15 as if fully set forth herein.

17.    Activision's agreements with teams in the *Overwatch* and *Call of Duty* Leagues to impose the Competitive Balance Tax violated Section 1 of the Sherman Act, 15 U.S.C. § 1.  The

4

Competitive Balance Tax substantially lessened competition between teams in the *Overwatch* and *Call of Duty* Leagues for esports players and limited the players' compensation.

18.     There is a reasonable expectation that the offense will recur unless the requested relief is granted.

## VI.     REQUESTED RELIEF

19.     The United States requests that this Court:

a.     adjudge that Activision's agreements with teams in the *Overwatch* and *Call of Duty* Leagues to implement the Competitive Balance Tax rules are unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1;

b.     permanently enjoin and restrain Activision from agreeing to or enforcing any rule that would, directly or indirectly, impose an upper limit on compensation for any player or players in any professional esports league that Activision owns or controls, including any rule that requires or incentivizes any team to impose an upper limit on its players' compensation or imposes a tax, fine, or other penalty on any team as a result of exceeding a certain amount of compensation for its players, and requiring Activision to take such internal measures as are necessary to ensure compliance with that injunction; and

c.     award the United States such other relief as the Court may deem just and proper to redress and prevent recurrence of the alleged violations and to remedy the anticompetitive effects of the illegal agreements entered into by Activision.

Dated: April 3, 2023

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES OF AMERICA,**

JONATHAN S. KANTER (DC Bar #473286)
Assistant Attorney General for Antitrust

DOHA MEKKI
Principal Deputy Assistant Attorney General
for Antitrust

MICHAEL B. KADES
Deputy Assistant Attorney General for
Antitrust

RYAN DANKS
Director of Civil Enforcement

MIRIAM R. VISHIO (DC Bar # 482282)
Deputy Director of Civil Enforcement

ERIC D. DUNN
Counsel to the Assistant Attorney General

DANIEL S. GUARNERA (DC Bar # 1034844)
Acting Chief
Civil Conduct Task Force

LARA TRAGER
Acting Assistant Chief
Civil Conduct Task Force

/s/ *Micah D. Stein*
MICAH D. STEIN (DC Bar # 177063)*
PETER NELSON
KATHLEEN KIERNAN (DC Bar # 1003748)
VICTOR LIU (DC Bar # 1766138)
Trial Attorneys

UNITED STATES DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
450 Fifth Street, NW
Washington, DC 20530
Telephone: (202) 705-2503
Facsimile: (202) 307-5802
Email: micah.stein@usdoj.gov

*LEAD ATTORNEY TO BE NOTICED